UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:18-cv-00019-FDW-DCK

| CATHERINE E. SHARKEY and RON SEAVAN, | ) |  |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | ORDER and NOTICE OF HEARING |
| FORTRESS SYSTEMS INTERNATIONAL, INC., d/b/a FORTRESS MOBILE, and ZHONG SU, individually, | ) | |
| Defendants. | ) | |

THIS MATTER is before the Court on Plaintiffs' Motion for Judicial Settlement Conference filed on May 8, 2019 (Doc. No. 31), Defendants' Motion for Summary Judgment filed on June 7, 2019 (Doc. No. 34), Plaintiffs' Motion for Partial Summary Judgment filed on June 7, 2019 (Doc. No. 36), and Plaintiffs' Motion to Strike and/or Objection (Doc. No. 42) to Defendants evidence submitted in support of Defendants Motion for Summary Judgment filed on June 21, 2019. For the reasons below, Plaintiffs' Motions (Docs. Nos. 31, 36, 42) are DENIED and Defendants' Motion for Summary Judgment (Doc. No. 34) is GRANTED IN PART and DENIED IN PART as set forth herein.

**I. Background**

Plaintiff, Catherine Sharkey, filed its initial Complaint on January 10, 2018 on two counts: (1) Defendants violated the Fair Labor Standards Act ("FLSA") by failing to pay employment taxes, keep accurate records of all hours worked by employees, and properly calculate and pay overtime to Plaintiff and similarly situated members; (2) Defendants willfully violated N.C. Gen.

1

Stat. §§ 95-25.6 by failing to pay Plaintiffs and similarly situated hourly employees all promised and earned wages and overtime payments on the employees' regular payday for all hours worked. (Doc. No. 1). Plaintiff brought the first cause of action as an "opt-in" collective action under 29 U.S.C. § 216(b). (Doc. No. 1). Plaintiff subsequently filed a Motion to conditionally certify a collective action and facilitate notice under 29 U.S.C. § 216(b) on July 27, 2018. (Doc. No. 17). The Court denied Plaintiff's motion for conditional certification on August 1, 2018. (Doc. No. 20).[1] Plaintiff filed an amended Complaint on March 11, 2019 with Plaintiff, Ron Sevean joining the collective action against Defendants on Counts I and II. (Doc. No. 29 at p. 1). Under the Amended Complaint, Plaintiff Sharkey also alleged: (1) Defendants violated the Equal Pay Act by providing Sharkey with lower pay and compensation than similarly situated male employees on the basis her gender ("Count III"); (2) Defendants violated Title VII of the Civil Rights Act by providing Sharkey with lower pay and compensation than similarly situated male employees based on her gender ("Count IV"); and (3) Defendants' termination of Sharkey was an act of retaliation as defined under Title VII of the Civil Rights Act ("Count V"). Defendants filed a Motion for Summary Judgment on all five Counts. Plaintiffs filed a Motion for Partial Summary Judgment on Counts I and II.

Defendant Fortress Systems, International, Inc. ("FSI") is a provider of mobile surveillance and smart fleet management solutions for pupil transit, mass transit, and commercial vehicle fleet and equipment management industries, and is headquartered in Charlotte, North Carolina. (Doc. No. 29 at p. 7). Defendant Zhong "Jack" Su has owned and operated FSI since 1991. (Doc. No.

---

[1] Denial of conditional certification does not mean the action cannot proceed as an FLSA collective action as conditional certification only refers to the district court's exercise of its discretionary power to facilitate the sending of notice to potential class members. See In re Family Dollar FLSA Litig., 637 F.3d 508, 518 (4th Cir. 2011)

37 at Ex. A). Plaintiffs, Catherine Sharkey and Ron Sevean worked at FSI and were classified as independent contractors during the relevant time period and both Plaintiffs signed Sales Agent Agreements ("SSAs") with FSI. (Doc. No. 29 at p. 2); (Doc. No. 34-5 at p.1-3).

Plaintiff, Catherine Sharkey was contracted to work for FSI in a sales position from April 1, 2017 through October 3, 2017. (Doc. No. 34-5 at p. 2). Under the initial SSA, Plaintiff Sharkey earned a 0.4% commission, a monthly salary of $6,000 and received a monthly draw[2] of $666.66 per month for the first twelve months. Id. On October 2, 2017, Plaintiff received an email from John Emory, FSI's SVP of Strategic Partnerships and Sharkey's direct supervisor, with a new Compensation Plan to become effective on that date. (Doc. No. 38-2 at p. 56). The new Compensation Plan reduced Plaintiff's Sharkey's base salary from $6,666 per month to $3,560 per month and increased her commission from 0.4% to one percent. (Doc. No. 34-5 at Ex. K). Plaintiff Sharkey was initially required to sign and accept the offer or resign by October 3, 2017, at 6 p.m. Id. The deadline to accept was extended to October 4, 2017, at 9 a.m. Id. Plaintiff Sharkey refused the offer and was terminated. (Doc. No. 29 at p. 13).

Plaintiff, Ronald Sevean, was contracted to work for FSI in a sales position from February 1, 2017 to March 21, 2017. (Doc. No. 34-5 at p. 3). Under the SSA, Plaintiff Sevean was paid two percent commission on total invoice sold, a monthly salary of $6,933, and a monthly draw of $400 per month for the first twelve months. (Doc. No. 38-2 at p. 63). Plaintiff Sevean was terminated on March 21, 2017, purportedly for poor performance. (Doc. No. 34-1 at p. 121).

---

[2] The "monthly draw" functioned as an advance on the sales agent's commission, which was to be eventually earned out by commission earned by the sales agent. The sales agent received the monthly draw during the first 12 months unless her commission exceeded the monthly draw amount. (Doc. No. 34-5, Ex. A).

In support of its Motion for Summary Judgment on Counts I and II, Plaintiffs rely on Zhong "Jack" Su's Deposition, documentary evidence produced in Discovery, Catherine Sharkey's Deposition, Ronald Sevean's Deposition, and Defendant's responses to Interrogatories.

In Su's Deposition, he testifies he did not know the difference between a 1099 and a W-2 prior this lawsuit and he did not consult an attorney as to whether those hired as contractors should have been hired as employees. (Doc. No. 38-1 at p. 20-31). He claims he hired sales agents as independent contractors because that was their preference (Doc. No. 38-1 at p. 41-44). Defendants converted all independent contractors to employees as a result of this lawsuit (Doc. No. 38-1 at p. 97). FSI employed 21 "independent contractors" from 2015 through 2018. (Ex. B at Fortress Document Production - 1). FSI did not pay employment taxes for those hired as independent contractors, (Doc. No. 38-1 at p. 171), and did not pay back wages to any of the converted W-2 employees. (Doc. No. 38-1 at p. 33).

Su further testifies in his Deposition that he did not keep track of Sales Agent's work hours and continues to not track their hours because they are now salaried employees. (Doc. No. 38-1 at p. 84-85). He claims to not know whether current sales team members work overtime or not, and their payment remains the same regardless of the number of hours worked. (Doc. No. 38-1 at p. 88). In response to Plaintiff Sharkey's request for all documents evidencing the number of hours worked, number of hours present on the job, number of hours required to be present on the job, any adjustments made to hours recorded, compensation paid, overtime paid, commissions paid, or bonuses paid, FSI responded, "[t]he only responsive documents regarding the named Plaintiff would be invoices submitted and emails originated by her and information contained on [FSI's] Zoho system, which will be produced." (Doc. No. 38-5 at p. 4). Plaintiff Sharkey testified in her

4

Deposition that she worked five to fifteen hours of overtime per week. (Doc. No. 38-3 at p. 9-11). Plaintiff Sevean testified in his Deposition that he typically began work at 8:00 a.m. and was still doing paperwork until 10:00 p.m. (Doc. No. 38-4 at p. 10-11).

Sharkey's and Sevean's "Sales Agent Agreements" produced in Discovery show FSI hired Sharkey and Sevean as "Sales Agents" and had them sign "Sales Agent Agreements" with nearly identical terms. (Doc. No. 38-2 at 62-75; 272; 331-346). Su claims in his Deposition that he relied on Sophie Oyuang, FSI's CFO, to write the SSAs and he trusted her to get it right even though he knew she did not consult legal counsel when writing them. (Doc. No. 38-1 at p. 98-99). Per the SSAs, "independent contractors" were provided a company credit card to pay for mileage and business expenses, a laptop and an ADSL hardline connection with a wireless router. (Doc. No. 38-2 at p. 64-66). Both SSAs bound Plaintiffs to confidentiality, copyright, non-disclosure, and proprietary information provisions. (Doc. No. 38-2 at p. 66-67). The SSAs also instructed Plaintiffs on policies and procedures for communication and handling of company records and data (Doc. No. 38-2 at p. 69-70). The SSAs listed several activities that Sharkey and Sevean were responsible for, including but not limited to, achieving a sales quota, making daily sales phone calls, sales appointments, attending trade shows and company trainings, and recording sales activities in the company's Zoho CRM. (Doc. No. 38-2 at 61). According to Su's Deposition, Su also set the number of customers sales agents were required to call, required them to log all calls and required them to report to him every day. (Ex. A at 99:17-102:10; 115:15-116:3). The SSA's included a termination clause, which provided that either the sales agent or the company could terminate the agreement with thirty days written notice. (Doc. No. 38-2 at 62).

5

Plaintiffs also cite Ron Sevean's Complaint to the New Jersey Department of Labor and Workforce Development ("NJDOL") following his termination, alleging that FSI failed to pay him his last paycheck and was owed $5,604.50 in unpaid wages. (Doc. No. 38-2 at 109). NJDOL sent a letter to Defendant Su directly to notify him of the claim. (Doc. No. 38-2 at 109). FSI paid Plaintiff Sevean $5,629.50 to settle the claim. (Doc. No. 38-2 at p. 116).

In support of its Motion for Summary Judgment on Counts I through V, Defendants rely on, Catherine Sharkey's Deposition, Ronald Sevean's Deposition, Zhong "Jack" Su's Deposition, Plaintiffs' Responses to Interrogatories, Sophia Oyuang's Declaration and its attached exhibits, and Mark Cotton's Declaration.

In her Declaration, Sophia Oyuang testifies that FSI hired Plaintiff Sharkey in early 2017 for a newly created position to support the outside sales team by making calls and setting up appointments for Mark Cotton and other outside sales personnel. (Doc. No. 34-5 at p. 1). In her Deposition, Plaintiff Sharkey testifies, "my understanding was that I was to support the sales team in the various activities that the outside salespeople had to do." (Doc. No. 34-1 at p. 20). Oyuang testifies Plaintiff Sharkey worked from home and was classified as an independent contractor. (Doc. No. 34-5 at p. 1).

According to Oyuang, Plaintiff Sevean worked for FSI as an outside salesperson from February 1, 2017 to March 21, 2017 and was also classified as an independent contractor. (Doc. No 34-5 at p. 3). Plaintiff Sevean testifies that his typical day was spent calling as many customers as possible by phone. (Doc. 34-2 at 6). He also went out and visited potential customers, estimating that he spent approximately seventy percent of his time at his home office and thirty percent of his time on the road. Id. at 8-11.

FSI did not keep track of either Sharkey's or Sevean's hours, nor pay them overtime. (Doc. No. 34-5 at p. 1-3). Oyuang further testifies that FSI contractors were expected to work eight hours per day, and the SSAs stipulated contractors "will occupy a home office on Monday to Friday from approximately 9:00 a.m. to 6:00 p.m." to allow contractors flexibility to plan their day and leave room for a one-hour lunch break. Id. Furthermore, FSI's published overtime policy prohibits overtime work without preapproval. (Doc. No. 34-5 at Ex. B). FSI also published Paycheck Problem Complaint Procedures that provided reporting instructions to workers who had questions about their paychecks, including questions about overtime. (Doc. No. 34-5 at Ex. I). According to Ouyang's testimony, neither Plaintiff questioned unpaid overtime pursuant to these procedures. (Doc. No. 34-5 at p. 4).

Oyuang testifies Plaintiff Sharkey and Plaintiff Sevean regularly invoiced FSI for their work and never requested payment in their invoices for overtime work. (Doc. No. 34-5 at p. 3). Included as Exhibits with Oyuang's Declaration are copies of invoices that Plaintiffs submitted to FSI for their work, and none of them make any claim for overtime payment. (Doc. No. 34-5 at Ex. F). Oyuang also testifies that Plaintiffs never otherwise communicated with FSI that they were working overtime or believed that they should be compensated for overtime work. (Doc. No. 34-5 at p. 3). She further states Plaintiffs never made a request for preapproval to work overtime and FSI was not aware that either Plaintiff claimed to have worked any overtime. Id.

Oyuang testifies Plaintiff Sharkey was not a particularly good performer as she was absent from 20.5 days of the 128 days she was contracted with FSI and attended fourteen customer meetings while at FSI. (Doc. 34-5 at p.2; Ex. E). Furthermore, FSI's call logging systems shows that Plaintiff Sharkey averaged 9.56 phone calls per day and FSI's Zoho CRM system shows that

7

Plaintiff Sharkey averaged 33.16 minutes of calls per working day. (Doc. No. 34-5 at Ex C and Ex. D). Plaintiff Sharkey's minimum call volume under her SSA was twenty calls per day. (Doc. No. 34-5 at p. 2). Mark Cotton also testified Plaintiff Sharkey "was not engaged as a salesperson" and "generated few useful appointments" for him. (Doc. No. 34-5 at p. 2). Furthermore, according to Oyuang, Plaintiff Sharkey only had three years of experience and few industry connections when she came to FSI as compared to Cotton who has over thirty-five years of experience and extensive industry connections that are valuable to FSI. (Doc. No. 34-5 at p. 4).

In October 2017, FSI restructured the compensation plans for three salespeople, Mr. Lonon, Mr. Meyer and Plaintiff Sharkey, thereby reducing each's monthly salary. (Doc. No. 34-5 at Ex. K). As part of the restructuring, Plaintiff Sharkey's commission was increased from 0.4% to one percent. Id. On October 2, 2017, John Emory sent an email to Plaintiff Sharkey, notifying her of the change in her compensation plan. (Doc. No. 34-1 at Ex. 16). Emory explained in the email the change in Plaintiff Sharkey's compensation plan was due to Plaintiff Sharkey not being able reach assigned sales activity goals and quota. Id. The next day, Plaintiff Sharkey responded to Emory's email requesting clarification on the decision to reduce her salary as she was under the impression that certain data regarding her sales performance was incorrect. Id. Emory responded that day at 4:51 p.m., explaining the offer was not negotiable, that Plaintiff Sharkey must sign and accept the offer or resign by 6 p.m., and failure to do so would result in termination. Id. In response, Plaintiff Sharkey again requested clarification and expressed she felt she was being "singled out," referencing Mark Cotton,[3] another salesperson, for purposes of comparison. Id. At

---

[3] Plaintiff Sharkey specifically compares herself to her "direct partner" in the email, (Doc. No. 34-1 at Ex. 16). However, the fact that Plaintiff Sharkey references Mark Cotton later in the email and that Plaintiff Sharkey and Mark Cotton were assigned "to be a team" at this point in time, (Doc. No 34-1 at p. 43), by reasonable inference Plaintiff Sharkey was referring to Mark Cotton when she wrote "direct partner." (Doc. No. 34-1 at Ex. 16).

6:29 p.m., Emory replied with a more detailed explanation for the change in compensation and refuted Plaintiff Sharkey was being "singled out" as FSI restructured the compensation plans of others on the sales team on September 25, 2017. (Doc. No. 34-1 at Ex. 16). Emory also stated in this reply, "[w]e require your decision by 9:00am tomorrow, Wednesday October 04, 2017. If no response by 9:00am, your relationship with Fortress Mobile is officially terminated." Id. Eventually, Plaintiff Sharkey refused to sign the restructured contract and was terminated. (Doc. No. 34-5 at p. 5).

Following his termination, Plaintiff Sevean filed a complaint with the NJDOL, claiming he was owed additional money because FSI did not provide proper notice of termination of his contract. (Doc. No. 34-5 at Ex. I). In his complaint, Plaintiff Sevean made no claims for overtime payment, and the NJDOL made no findings to that effect through its investigation. Id.

## II. Standard of Review

FED R. CIV P. 56(a) provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See also Celotex Corp v. Catrett, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the

9

movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in their pleadings. Id. at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion; there must be evidence on which a reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Rule 56 (b) further provides:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular part of materials in the record, including deposition, documents, electronically stored information, affidavits or declaration, stipulations . . . admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited to do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

See also Celotex Corp., 477 U.S. at 323 (1986).

### III. Analysis

**A. The Parties' Motions for Partial Summary Judgment on Count I: Fair Labor Standards Act**

Under FLSA 29 U.S.C. § 207 "no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in

an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." The term "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "Employee" is defined as "any individual employed by an employer," and an entity "employs" someone if it "suffers or permits [the individual] to work." 29 U.S.C. § 203 (e)(1) and (g).

Under FLSA, "the employer . . . has the duty . . . to keep proper records of wages, hours and other conditions and practices of employment." Id.; see also 29 C.F.R. § 516.2. In situations where the "employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes," an employee discharges their burden by proving "he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946). If a plaintiff satisfies this burden "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." Id. at 687-88. The Fourth Circuit has also held a plaintiff must prove "the defendant[s] knew or should have known that the plaintiff[s] were working overtime for the employer." Davis v. Food Lion, 792 F.2d 1274, 1277 (4th Cir. 1986); see also Talton v. I.H. Caffey Distrib. Co., 124 F. App'x 760, 763 (4th Cir. 2005) (per curium) (unpublished).

Here, the parties' evidence and arguments make clear several disputed questions of fact exists, including, but not limited to, whether Defendant Su is an "employer" under FLSA, whether

Plaintiffs were misclassified as independent contractors in their respective positions, whether Plaintiffs performed overtime work for which they were improperly compensated, and whether Defendants knew or should have known Plaintiffs were working overtime. In large part, resolution of these issues requires weighing the credibility and the evidence, both of which are inappropriate at this stage. Accordingly, summary judgment is inappropriate for any party based on the record evidence before the Court.

**B. The Parties' Motions for Summary Judgment on Count II: North Carolina Wage and Hour Act**

In their Amended Complaint, Plaintiffs allege Defendants violated North Carolina General Statutes §§ 95-25.6, 95-25.7 and 95-25.13 "by failing to pay Plaintiffs all promised and earned wages and overtime payments on the employees' regular payday for all hours worked." (Doc. No. 29 at p. 15.) Plaintiffs also contend Defendants failed to pay "Plaintiffs all promised and earned wages and overtime payments on the employees' regular payday for all hours worked." Id. The evidence before the court in support of this claim relies wholly on failure to pay overtime wages. Under North Carolina General Statutes § 95-25.14(a):

> [t]he provisions of G.S. 95-25.3 (Minimum Wage), G.S. 95-25.4 (Overtime), and G.S. 95-25.5 (Youth Employment), and the provisions of G.S. 95-25.15(b) (Record Keeping) as they relate to these exemptions, do not apply to: (1) Any person employed in an enterprise engaged in commerce or in the production of goods for commerce as defined in the Fair Labor Standards Act.

Notably, none of these provisions under which Plaintiffs seek relief are listed as an exemption under § 95-25.14(a). With respect to overtime wages, the Eastern District of North Carolina has held that "FLSA provides Plaintiffs' exclusive remedy and preempts [overtime] wage claims." Romero v. Mountaire Farms, Inc., 796 F. Supp. 2d 700, 710 (E.D.N.C. 2011); see also

Lima v. MH & WH, LLC, No. 5:14-CV-896-FL, 2019 WL 2602142, at *15 (E.D.N.C. Mar. 8, 2019), (holding "that portion of plaintiff's NCWHA claim premised upon overtime pay must be dismissed as exempted based upon the plain language of § 95-25.14(a)"), reconsideration denied, No. 5:14-CV-896-FL, 2019 WL 2323865 (E.D.N.C. May 30, 2019); DeHoll v. Eckerd Corp., No. 1:18CV280, 2018 WL 5624150, at *5 (M.D.N.C. Oct. 30, 2018) ("allowing Plaintiffs to recover unpaid overtime under the payday statute would be wholly incompatible with the exemption provision.")).

Nothing in Plaintiffs' Complaint suggests Defendants failed to pay Plaintiffs' wages other than the overtime they allege is owed to them, and if there were other issues concerning wages that Plaintiff sought to argue, it is well-established that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed *waived*," United States v. Layne, 192 F.3d 556, 566 (6th Cir. 1999) (emphasis added). Because no record evidence exists to support Plaintiffs' claims under the NCWHA other than their evidence related to failure to pay overtime, summary judgment for Defendants is appropriate. Therefore, Defendants' Motion for Summary Judgment on Count II is GRANTED, and Plaintiffs' Motion for Partial Summary Judgment on Count II is DENIED.

**C. Defendant's Motion for Summary Judgment on Counts III and IV – Equal Pay Act and Title VII**

On Count III, Plaintiff Sharkey alleges Defendants violated the Equal Pay Act (EPA) by paying Plaintiff Sharkey a lower wage than similarly situated males on the basis of her gender. Under 29 U.S.C. § 206(d)(1):

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by

> paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions

A plaintiff must establish a prima facie case of discrimination under the EPA by proving "(1) the defendant-employer paid different wages to an employee of the opposite sex (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions." U.S. Equal Employment Opportunity Comm'n v. Maryland Ins. Admin., 879 F.3d 114, 120 (4th Cir. 2018) (citing Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974). "The comparison must be made 'factor by factor with the male comparator.' Additionally, the plaintiff must identify a particular male 'comparator' for purposes of the inquiry, and may not compare herself to a hypothetical or 'composite' male. Strag v. Bd. of Trustees, Craven Cmty. Coll., 55 F.3d 943, 948 (4th Cir. 1995) (citing Houck v. Virginia Polytechnic Inst. & State Univ., 10 F.3d 204, 206 (4th Cir. 1993; see also Evans v. Int'l Paper Co., No. CV 3:16-1215-JMC-KDW, 2018 WL 3120670, at *25 (D.S.C. Feb. 12, 2018).

If Plaintiff successfully establishes a prima facie case, the burden of proof shifts to Defendants "to show that the wage differential was justified by one of four affirmative defenses listed in the statute," which are: "(1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; or (4) a disparity based on any factor other than gender." Maryland Ins. Admin., 879 F.3d at 120. Defendants' burden of proof with respect to proving one of the affirmative defenses is "evidence from which a reasonable factfinder could conclude not simply that the employer's proffered reasons *could* explain the wage disparity, but that the

proffered reasons do *in fact* explain the wage disparity." Id. at 121. If a defendant fails to meet this burden, Plaintiff prevails. Id. at 120 (emphasis in the original).

Under Title VII, a plaintiff may establish a wage discrimination claim by (1) providing direct evidence of intentional discrimination. Brinkley–Obu v. Hughes Training, Inc., 36 F.3d 336, 343 (4th Cir. 1994). In the alternative, (2) a plaintiff may plead her case circumstantially "by demonstrating that she is female, i.e., a member of a protected class, and that the job she occupied was similar to higher paying jobs occupied by males." Id. (citing Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1526 (11th Cir. 1992)).

As to Defendant Su, the Court finds that individual liability under Title VII is inappropriate here. Lissau v. S. Food Servs., Inc., 159 F.3d 177, 180 (4th Cir. 1998) (supervisors not liable in their individual capacities for Title VII violations); Jones v. Sternheimer, 387 F. App'x 366, 368 (4th Cir. 2010) ("Title VII . . . do not provide for causes of action against defendants in their individual capacities."). Summary judgment for Defendant Su is therefore appropriate on this claim and that portion of Defendants' Motion for Summary Judgment is GRANTED.

The Court finds Plaintiff Sharkey has presented minimally sufficient evidence to create a dispute over issues of fact to survive the remainder of Defendants' motion on these two claims, including Defendant Su's potential individual liability on Plaintiff' Sharkey's claim under the Equal Pay Act. See Dixon v. Univ. of Toledo, 638 F. Supp. 2d 847, 854–55 (N.D. Ohio 2009).[4] Accordingly, Defendants' motion is GRANTED IN PART and DENIED IN PART.

---

[4] In Dixon, the court explained:
> "In order to hold a defendant individually liable under the EPA, the defendant must be an "employer" as defined by the EPA. See 29. U.S.C. § 206. The EPA is an extension of the FLSA and incorporates the same definitions for the term "employer" and thus it is interpreted similarly. Wascura v. Carver, 169 F.3d 683, 686 (11th Cir. 1999) (citing Corning Glass Works v. Brennan,

**D. Defendants' Motion for Summary Judgment on Retaliation**

In order to set forth a claim for retaliation, Plaintiff Sharkey must establish she engaged in a protected activity, Defendants took an adverse action against her, and a causal relationship existed between her protected activity and the adverse action. Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006). Plaintiff must show that her alleged protected activity was the "but-for cause" of her termination. Univ. of Texas Southwest Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013); see also Netter v. Barnes, 908 F.3d 932, 940 (4th Cir. 2018) (holding an employee claiming retaliation must show that she "would have remained employed in [the] absence" of her protected conduct).

Here, Plaintiff contends she engaged in projected activity when she sent an email saying she was being singled out for unequal pay through the prior offer of a new compensation plan that reduced her base salary and increased her commission. On October 2, 2017, Plaintiff received an email from John Emory, FSI's SVP of Strategic Partnerships and Sharkey's direct supervisor, with a new Compensation Plan to become effective on that date. Plaintiff Sharkey was initially required to sign and accept the offer or resign by October 3, 2017, at 6 p.m. Id. Instead, Plaintiff "immediately complained to her supervisor that she was being 'singled out' and that her male counterpart . . . was not being forced to take a pay reduction." (Doc. No. 29, p. 18.) After the deadline to accept was extended to October 4, 2017, Plaintiff Sharkey refused the offer and was terminated. (Doc. No. 29, p. 13).

---

417 U.S. 188, 190, 94 S.Ct. 2223, 2226, 41 L.Ed.2d 1 (1974) (noting that the Equal Pay Act of 1963, 77 Stat. 56, § 3, merely "added to § 6 of the Fair Labor Standards Act of 1938 the principle of equal pay for equal work regardless of sex")). Furthermore, the FMLA interprets the term "employer" invariably with the FLSA. Mitchell v. Chapman, 343 F.3d 811, 827 (6th Cir. 2003); Wascura, at 685–686 ("FMLA's definition of 'employer' is more similar to, actually it is materially identical with, the definition of 'employer' used in the [FLSA], 29 U.S.C. § 203(d)").

The sequence of events in this case foreclose the possibility that Plaintiff Sharkey can establish causation, particularly where her own pleadings make clear her alleged protected activity (complaining to her supervisor that the new compensation plan resulted in unequal pay) took place *after* the alleged adverse action of reducing her salary via the new compensation plan. Plaintiff Sharkey's failure to accept the new compensation plan resulted in her termination. Plaintiff Sharkey has not any presented evidence to show *any* protected activity was the "but-for cause" of her termination. Accordingly, summary judgment for Defendants is appropriate on Plaintiff Sharkey's retaliation claim.

### IV. Plaintiffs' Motion to Strike

Plaintiffs filed a Motion to Strike Defendants' Motion for Summary Judgment and/or evidence submitted in support of Defendants' Motion for Summary Judgment. In support of their motion Plaintiffs challenge the following evidence: (1) three deposition transcripts filed by Defendants in support of Defendants' Motion for Summary Judgment, (2) Mark Cotton's Declaration and (3) Sophia Ouyang's Declaration. (Doc. No. 42). For the reasons stated in Defendants' opposition to the motion (Doc. No. 43), this motion is summarily denied.

### V. Plaintiffs' Motion for Judicial Settlement Conference

Pursuant to LCvR 16.3(d)(1) Plaintiffs' filed a Motion for Judicial Settlement Conference on May 8, 2019, (Doc. No. 31), which was opposed by Defendants on May 22, 2019. (Doc. No. 32). Parties mediated this matter on May 8, 2019 to impasse (Doc. No. 33). Discovery closed on May 10, 2019 and Dispositive Motions were submitted on June 7, 2019. (Doc. No. 34); (Doc. No. 36). Because Defendants' oppose the motion, the Court finds the interests of judicial efficiency would not be served by a judicial settlement conference at this time. The motion is DENIED

WITHOUT PREJUDICE should the parties consent to request a judicial settlement conference.

## VI.  Conclusion

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 36), Plaintiffs' Motion for Judicial Settlement Conference (Doc. No. 31), and Plaintiffs' Motion to Strike (Doc. No. 42) are DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. No. 34) is GRANTED IN PART and DENIED IN PART as set forth herein.

IT IS FURTHER ORDERED this matter is *sua sponte* continued for trial to the Court's term beginning November 4, 2019.

**TAKE NOTICE that a pretrial conference in this matter shall take place on October 1, 2019, at 10:00 a.m. in Courtroom #1-1 of the Charles R. Jonas Building.** The parties' joint pretrial submissions shall be submitted in accordance with the Pretrial Order and Case Management Plan entered in this case (Doc. No. 16).

IT IS SO ORDERED.

Signed: August 13, 2019

Frank D. Whitney
Chief United States District Judge